# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CORNER POCKET, INC., )
)
    Plaintiff, )
)
v. ) Civil Action No. 12-288
) Judge Nora Barry Fischer
TRAVELERS INSURANCE, )
)
    Defendant. )

## MEMORANDUM ORDER

Pending before the Court is a Motion filed by Defendant Travelers Insurance ("Travelers") to exclude the proffered expert testimony of Ryan M. Pierce. (Docket No. 31). Plaintiff Corner Pocket, Inc., ("Corner Pocket") opposes this Motion. (Docket No. 36). Following briefing (Docket No. 32, 36), and the Court's review of Mr. Pierce's deposition (Docket No. 36-1), this Court heard oral argument on the Motion on July 19, 2013. (Docket No. 40). Accordingly the Motion is now ripe for disposition. For the following reasons, Travelers' Motion [31] is DENIED, without prejudice.

## I. BACKGROUND

### A. Factual Summary

This is a breach of contract action in which Corner Pocket alleges that Travelers failed to properly honor Plaintiff's insurance policy ("the Policy"). (Docket No. 37 at 1-2). The Policy covers damages to Plaintiff's building located at 2000 Eden Park Boulevard, McKeesport, Pennsylvania ("the Building") with certain exclusions. (Docket No. 35-2 at 17; Docket No. 35-3). The dispute revolves around the total amount of money that Travelers owes to Corner Pocket under the Policy following damage suffered to the Building in February 2010. (Docket No. 37 at

1

1-2). Plaintiff claims that the roof and roof decking[1] to the Building were both damaged by heavy snowfall, a loss covered under the policy. (*Id.*). Defendant maintains that the damage to the roof decking was not caused by snowfall, but rather by long-term deterioration, rust, and decay, which is not insured under the policy. (Docket No. 35 at 2-3). In its Motion for Summary Judgment Defendant also opposes compensating Plaintiff for consequential damages. (Docket No. 33 at 1). Travelers has therefore only reimbursed Corner Pocket for the value of the roof replacement. (Docket No. 1 at 5-6).

Both parties rely on expert testimony to substantiate their positions. Travelers' conclusion as to the cause of the roof decking damage is supported by the testimony of forensic engineer, Scott M. Wasson.[2] (Docket No. 35 at 3; Docket No. 35-6 at 3). Plaintiff relies on the opinions and testimony of architect, Ryan M. Pierce. (Docket No. 37 at 2). Defendant maintains that Mr. Pierce is not qualified to render an expert opinion as to whether the roof collapse at issue was caused by snow and ice buildup or long-term decay. (Docket No. 32 at 3). Travelers elaborates that Mr. Pierce's experience and qualifications lie in structural planning and building design, but not in evaluating the cause of structural failures which Travelers asserts is within the

---

[1] The roof deck is a special layer of roofing material put down between the primary structure of the building, such as the trusses and joists, and the insulation/weatherproofing layer. The roof deck ties all of the structural parts of the roof together. http://www.sevacall.com/blog/2012/11/s/roofers/what-is-roof-decking-material/.

[2] Scott M. Wasson is a Senior Forensic Engineer with Donan Engineering Company, Inc. (Docket No. 32-2 at 3, 6). Neither party has submitted further information regarding Mr. Wasson's education or background. The Court, however, takes judicial notice of the following record from the Pennsylvania Department of State: Mr. Wasson is a professional engineer, licensed to practice in Pennsylvania. *See* PENN. DEPT. OF STATE LICENSE CHECK available at http://www.licensepa.state.pa.us/Search.aspx; s*ee Kos Pharma., Inc. v. Andrx Corp.,* 369 F.3d 700, 705 n. 5 (3d Cir. 2004) (holding that documents found on an agency's website were noticeable as "public records"). According to the Court's further research, prior to joining Donan Engineering, Mr. Wasson worked for Atlantic Engineering Services, Monroe & Newell Engineers Inc., and CBM Engineers Inc. *See*, http://www.linkedin.com/pub/scott-wasson/2b/97/7a0. He received his Bachelors of Science in Civil Engineering from Penn State University in 1993. *Id.*

realm of engineering expertise. (*Id.* at 6). Hence, Travelers has moved to exclude Mr. Pierce's testimony. (*Id.* at 7).

**B. Ryan M. Pierce**

Mr. Pierce is currently employed as an architect and principal at his own architectural and construction management firm, J.C. Pierce, LLC.[3] (Docket No. 36-1 at 6). He holds a four-year Bachelor of Science degree in architecture and a fifth year professional Bachelor of Architecture degree from Penn State University, received in 1988. (*Id.* at 6-7). Mr. Pierce has completed continuing education classes at the University of Wisconsin, Penn State, and Harvard University. (*Id.*). He has also taken additional courses in structural engineering and mechanical engineering. (*Id.* at 9).

Mr. Pierce's broad experience as a registered architect spans nearly twenty five years. (Docket No 32-4 at 24). He has experience in strategic master planning, design, project management, and construction administration. (*Id.* at 25). He is well-versed in a variety of building and construction types. (*Id.* at 25-30). He has substantial experience in roof-related matters. (*Id.*). Mr. Pierce regularly consults on asset protection and maintenance projects such as reroofing, mechanical and electrical systems upgrades, as well as building structural and foundations. (*Id.* at 25).

As to roofing, Mr. Pierce has completed various projects for seventeen different Pennsylvania, Ohio, and Georgia schools, including roof replacement and roof work at nine

---

[3] Located at 360 Lincoln Ave Bellevue, PA 15202, J.C. Pierce LLC provides professional Architectural, Engineering, Interior Design, and Construction Management Advisory Services to public school districts and other clients in the southwestern Pennsylvania region. http://www.jc-pierce.com/. President and CEO Mr. Pierce founded the company in 2008. *Id.*

3

facilities.[4] (Docket No. 32-4 at 28). Mr. Pierce and his firm also completed additions, renovations, and numerous other projects at many of these schools. (*Id.* at 28-29). He also has experience working on commercial properties. His Curriculum Vitae lists thirteen commercial entities[5] including UPMC and the Port Authority of Allegheny County by which he and his firm have been engaged. (*Id.* at 29).

During his career, Mr. Pierce has personally performed the calculations necessary to determine how much weight can be supported by a roof ("roof load calculations"). (Docket No. 36-1 at 11). Mr. Pierce routinely conducts physical roof inspections, and has worked on "quite a few roof replacement projects." (*Id.* at 12, 15). Although Mr. Pierce has never provided an expert opinion on roof deck failure before being retained in this case, he has been called upon by building owners in the past to explain why roofs have failed. (*Id.* at 25). He is also familiar with the effects of rust on roof decking. (*Id.* at 73, 91).

With regard to his analysis of the damage at Plaintiff's Building, Mr. Pierce's employee, Craig Scott,[6] conducted the first examination of the roof in July of 2010, and documented his

---

[4] The roof work was done for McClellan Elementary School and Pleasant Hills Middle School of West Jefferson Hills School District, and seven schools within the Bethel Park School District. (Docket No. 32-4 at 28). Mr. Pierce has performed different types of work for McKeesport Area School District, Forbes Road Career and Technology Center, Elizabeth Forward School District, Moon Area School District, Archdiocese of Philadelphia Schools, Yough School District, School District of Philadelphia, Quaker Valley School District, Career and Technology Center of Licking County Ohio, Clairton City School District, Bethlehem-Center Area School District, Hempfield Area School District, Connellsville Area School District, DeKalb County School System (Atlanta Georgia). (Id. at 28-29).

[5] Mr. Pierce has done work for commercial entities including Mazzel Development, Echo Development, Best Oil, Inc., Orr's Jewelers, Guggenheim Partners, Rubinoff Company, Harbor Gardens/Bidwell, Inc., Port Authority of Allegheny County, York International Vision Financial, Bidwell Training Center, UPMC, and Urban League of Pittsburgh. (Docket No. 32-4 at 29).

[6] Again the parties did not submit any evidence regarding Mr. Scott's background. Thus, the Court takes judicial notice of the following record from the Pennsylvania Department of State: Mr. Scott is a registered architect, licensed to practice in Virginia. *See* PENN. DEPT. OF STATE LICENSE CHECK available at http://www.licensepa.state.pa.us/Search.aspx; s*ee Kos Pharma., Inc.* 369 F.3d at n. 5. Mr. Scott was laid off due to a decrease in workload. (Docket No 36-1 at 83). Mr. Pierce testified that he was forced to lay him off for financial reasons; however, there were never any problems with Mr. Scott's job performance. (*Id.*).

findings with photos. (Docket No. 36-1 at 40-43). During this inspection Mr. Scott went on to the roof, and inspected the areas which had sustained damage. (*Id.* at 46). He walked across the roof, and was thereby able to locate weakened areas of the roof and deck. (*Id.* at 46-47). Mr. Scott also used a ladder to access the roof deck, and scraped the deck surface in order to determine if there was any surface or structural rust damage. (*Id.*). In addition, he examined other structural elements of the Building, such as the roof joists. (*Id.*). Mr. Scott relayed his findings to Mr. Pierce, who in turn incorporated them into his August 25, 2010 report detailing the condition of the roof. (*Id.* at 40-43).

Mr. Pierce also visited the site himself in the fall of 2010, and conducted a visual examination of the Building. (*Id.* at 47-48, 78-79). The goal of his personal visit was to observe the conditions of the Building, and ensure he had a "good understanding of what we were dealing with." (*Id.* at 47, 78). Mr. Pierce inspected the inside of the premises, and examined the roof decking from a distance. (*Id.* at 78-79). Another employee of Mr. Pierce, William Cook,[7] conducted a subsequent visual inspection of the site in May of 2011, which he also documented with photos. (*Id.*). Mr. Cook provided his findings to Mr. Pierce. (*Id.* at 43).

Mr. Pierce believes that the damage to the roof decking of Plaintiff's Building was caused by excessive snow weight and not by rust. (*Id.* at 91, 95-98). In reaching his ultimate conclusion, Mr. Pierce relies on his background and expertise, the reports made by his

---

[7] There is no information in the record on Mr. Cook. As such, the Court takes judicial notice of the following record from the Pennsylvania Department of State: Mr. Cook is a registered architect, licensed to practice in Pennsylvania. *See* PENN. DEPT. OF STATE LICENSE CHECK available at http://www.licensepa.state.pa.us/Search.aspx; s*ee Kos Pharma., Inc.* 369 F.3d at n. 5. The Court's further research indicates that Mr. Cook is now employed as an architect with MS Consultants, Inc since November 2012. *See,* http://www.linkedin.com/pub/william-cook-ra/20/b53/a78. Mr. Pierce stated that there had been no issues with Mr. Cook's job performance during his employment with J.C. Pierce. (Docket No. 36-1 at 83).

employees,[8] photos of the roof, testimony from the Building owners, and his personal visit to the Building following its collapse. (*Id.* at 40-41, 92-94).

## II. LEGAL STANDARD

Federal Rule of Evidence 702, which memorializes the Supreme Court's seminal case *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provides the basic framework for the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. The United States Court of Appeals for the Third Circuit has held that "[t]he district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury." Fed. R. Evid. 702.; *see also IP Innovation L.L. C. v. Red Hat, Inc.*, 705 F. Supp. 2d 687, 689 (E.D. Tex. 2010) (Rader, J.) (quoting *Daubert*, 509 U.S. at 589) ("The district court acts as a gatekeeper tasked with the inquiry into whether expert testimony is 'not only relevant, but reliable.'"). In this role, the district court is not the finder of fact, but must focus on the methodology of the expert in order to "satisfy itself that 'good grounds' exist for the expert's opinion." *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) (citing *Daubert*, 509 U.S. at 590); *In re TMI Litigation*, 193 F.3d 613, 713 (3d Cir. 1999) (district court should not conflate "its gatekeeping function with the fact-finders' function as the assessor of credibility").

---

[8] Of note, neither party took the depositions of Mr. Scott and Mr. Cook.

*Daubert* does not require that a party who proffers expert testimony demonstrate that the expert's assessment of the situation is correct. 509 U.S. at 590. As long as an expert's scientific testimony rests upon "good grounds, based on what is known," it should be tried by the adversary process (using competing expert testimony and active cross-examination) rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its adequacy. *Id.* In short, *Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance. *Id.* It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable manner. *Mitchell*, 365 F.3d at 244 (quoting *Ruiz–Troche v. Pepsi Cola Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) (citations omitted); *see also Kannankeril v. Terminix Intern., Inc.*, 128 F.3d 802, 809 (3d Cir. 1997) ("The trial judge must be careful not to mistake credibility questions for admissibility questions.").

## III. ANALYSIS

Travelers' main challenge to Mr. Pierce's proffered expert testimony focuses on the architect's qualifications. (Docket No. 32 at 3, 7). Specifically, Travelers claims that Mr. Pierce is unqualified to offer testimony regarding what caused the Building's roof to collapse because he is an architect and not a structural engineer. (*Id.*). Defendant secondarily attacks Mr. Pierce's methodology, arguing that he did not measure the amount of snow on the roof, review or rely on reported weather data, or personally inspect the roof condition prior to issuing his report. (*Id.* at 3).

### A. Qualifications

The Court first turns to the challenge to Mr. Pierce's qualifications to render his opinion regarding causation of the roof collapse in this case. In the Third Circuit, an expert witness must have "specialized knowledge" in the area of his testimony. *See Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) ("Rule 702 requires the witness to have 'specialized knowledge' regarding the area of testimony.").

> The basis of this specialized knowledge "can be practical experience as well as academic training and credentials." [The United States Court of Appeals for the Third Circuit has] interpreted the specialized knowledge requirement liberally, and ha[s] stated that this policy of liberal admissibility of expert testimony "extends to the substantive as well as the formal qualification of experts." However, "at a minimum, a proffered expert witness ... must possess skill or knowledge greater than the average layman...."

*Id.* at 625 (citations omitted). The Court of Appeals has further explained that:

> [b]ecause of our liberal approach to admitting expert testimony, most arguments about an expert's qualifications relate more to the weight to be given the expert's testimony than to its admissibility. Thus, witnesses may be competent to testify as experts even though they may not, in the court's eyes, be the "best" qualified. Who is "best" qualified is a matter of weight upon which reasonable jurors may disagree.

*Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 782 (3d Cir. 1996); *see also Pineda v. Ford Motor Co.*, 520 F.3d 237, 245 (3d Cir. 2008) (reversing the district court and holding that expert should have been qualified under Rule 702 even if he was not the "best qualified" expert or possessed the precise "specialization" that the district court deemed appropriate).

The mere fact that Mr. Pierce is an architect instead of an engineer, as the Defense argues, is insufficient to disqualify him. (Docket No. 32 at 3, 7). There is no per se rule against architects testifying on matters such as this. Courts have recognized that the roles of architects

and engineers intersect "significantly." *Grace v. Morgan*, 2006 WL 2065172 (Del. Super. July 25, 2006). In fact, architects have been permitted to testify as experts regarding both architectural and engineering issues in other instances. *See, e.g., Imperial Trading Co., Inc., v. Travelers Property Cas. Co. of America*, 2009 WL 2408412 (E.D. La. July 28, 2009); *see also Bray & Gillespie IX, LLC v. Hartford Fire Ins. Co.*, 6:07-CV-326-ORL-DAB, 2009 WL 1046354 (M.D. Fla. Apr. 20, 2009) (finding that interpreting engineering code requirements and estimating building damage and repair or rebuild costs is well within an architect's expertise for *Daubert* purposes). Further, in Pennsylvania the licensing statutes demonstrate that there is overlap between the engineering and architectural professions.[9] Indeed, Mr. Pierce himself stated that, in the course of their work, architects are responsible for considering issues such as structural integrity and weight-bearing, which overlap or are very similar to the duties performed by an engineer. (Docket No. 36-1 at 9-11). He continued that roof load calculations are often performed by engineers, but certain architects conduct them as well. (*Id.* at 10-11).

Even if an engineer may be "best qualified" in Defendant's or even the Court's opinion, to testify about the cause of a roof collapse, this does not preclude an architect like Mr. Pierce from being sufficiently qualified to testify as an expert. *See*, *Carnegie Mellon University v. Marvell Tech. Group, LTD*, 2012 WL 6562221 at *11 (W.D. Pa. 2012) (Fischer, J) (citing

---

[9] 63 P.S. § 34 and § 37 outline the licensing and qualification process for architects and engineers, respectively. § 63.15 indicates that certain practices of architecture may be incidental to engineering work, and therefore, engineers do not need to be certified in both fields in order to perform these duties. This congeals with the Court's understanding of the roof load calculations at issue in this case, which can be performed by either an engineer or an architect. Admittedly, Pennsylvania courts have determined when evaluating § 63.15 that the definition of engineering is broader than that of architecture. *Rosen v. Bureau of Professional and Occupational Affairs*, 763 A.2d 962 (Pa. 2000). However, this does not mean that roof load calculations are outside the expertise of architects. In fact, the practice of architecture is defined as services in connection with the design and construction of structures for the principal purpose of human habitation or use, to include planning, providing preliminary studies, designs, drawings, specifications, and other design documents, construction management and administration of construction contracts. § 34.3.

*Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 782 (3d Cir. 1996). The Court's inquiry focuses on whether Mr. Pierce has prior experience sufficiently similar to the issue presented on which he will testify as an expert in order to be qualified. *Curtis v. Wilks*, 704 F. Supp. 2d 771, 777; *Quality Time, Inc., and Tammie Geldenhuys v. West Bend Mut. Ins. Co.*, 2013 WL 1114466 (D. Kan. March 18, 2013) (disqualifying an architect who had never conducted a "forensic examination" of a building collapse, had no experience in wood science or strength, and testified that his opinions regarding decay were based on speculation). The witness' relevant experience must also be "sufficiently broad" to encompass the relevant issue. *Montefiore Medical Ctr. V. American Protection Ins. Co.*, 2003 WL 21108232 (S.D.N.Y. May 14, 2013) (The court observed that the witness had extensive general experience in the construction industry; however, no information was presented to demonstrate that he had any experience in building deterioration, construction, or causation issues). The Court must examine Mr. Pierce's specific experience and training to determine whether he meets the requisite qualification, rather than evaluating him based solely on his occupation.

Mr. Pierce holds two degrees in architecture, and has also received training in structural and mechanical engineering. (Docket No. 36-1 at 6-7, 9). In addition to being trained in structural engineering, he appears to have sufficient experience related to the issues underlying the Plaintiff's Building damages claim. Mr. Pierce has an extensive work history involving roofing work for various school districts and corporate entities. (Docket No. 32-2 at 25-29). He has personally performed the type of roof load calculations which are relevant to determining how much snow would have been necessary to cause the roof collapse here. (Docket No. 36-1 at 11). His familiarity with the effects of rust on roof decking further speak to his ability to

evaluate roof failure. (*Id.* at 73, 91). Although an engineer might be similarly qualified, or even "best qualified," to render such an opinion, Pierce has "specialized knowledge" sufficient to satisfy the minimum Rule 702 requirement. Therefore, the Court finds because of his training, experience, and knowledge, Mr. Pierce is sufficiently qualified to testify as an expert regarding the roof collapse here. The Defendant can further test his expertise by cross examination at trial. *Carnegie Mellon University v. Marvell Technology Group, Ltd.*, 2012 WL 5989194 at *3 (Fischer, J) (citing *Daubert*, 509 U.S. at 596).

### B. Methodology

With respect to Traveler's ancillary argument attacking Mr. Pierce's methodology, Defendant criticizes Mr. Pierce for not measuring the amount of snow on the roof, failing to review or rely on reported weather data, and also failing to personally inspect the roof condition prior to issuing his report. (Docket No. 32 at 3). The Court notes that in reaching his ultimate opinion, Mr. Pierce relied on reports made by his employees, photos of the roof, testimony from the Building owners, and his own inspection of the Building following its collapse. (Docket No. 36-1 at 40-41, 92-94).

Mr. Pierce testified that his evaluation techniques, and the evaluation techniques used by his employees upon whose reports and opinions he relied, are widely used by architects and engineers alike when evaluating a roof. (Docket No 36-1 at 24-25). Inspection of the decking typically involves physically examining the deck for any visually weak areas. (*Id.* at 16). If a weak area is located, the deck is sometimes struck with a hammer or similar tool to determine the extent of the weakness. (*Id.* at 16-17). The decking is also visually examined for rust, and any

such rust is evaluated in order to determine whether it is superficial or structural in nature.[10] (*Id.* at 1).

Mr. Pierce testified that he believed the inspections conducted by his employees conformed to this approach. (*Id.* at 44-47). The results of Mr. Scott's extensive evaluation were relayed to Mr. Pierce, who then incorporated them into his August 25, 2010 report detailing the condition of the roof. (*Id.* at 40-43). The results of Mr. Cook's inspection of the site in May of 2011 were also relayed to Mr. Pierce. (*Id.*). Mr. Pierce himself personally observed the condition of the Building following its collapse in Fall 2010. (*Id.* at 47-48, 78-79). Mr. Pierce, therefore, brings the totality of information received from his two employees, as well as his own observations, to bear in reaching an expert opinion regarding the subject roof collapse here.

Generally, "an expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." FED. R. EVID. 703. An expert need not base his opinion on first-hand knowledge, and in fact can rely on observations made by others as well as their own expertise. See *Daubert*, 509 U.S. at 592. To that end, Mr. Pierce is well within his purview to rely on Mr. Cook or Mr. Scott's observations and conclusions in forming his own opinion regarding the Building damages. Travelers failed to depose either Mr. Cook or Mr. Scott. At present, it has no grounds to oppose the factual underpinnings of the information provided by Mr. Pierce's employees. In its "gatekeeper" role, the district court is not the finder of fact, but must focus on the methodology of the expert in order to "satisfy itself that 'good grounds' exist for the expert's opinion." *Mitchell,* 365 F.3d at 244 (citing *Daubert,* 509 U.S. at 590); *In re TMI Litigation,* 193 F.3d at 713 (district court should not conflate "its gatekeeping

---

[10] Surface rust can be easily scraped off, while structural rust damage will flake off "like pie crust." (Docket No. 36-1 at 18).

function with the fact-finders' function as the assessor of credibility"). Given the information available to the Court, including Mr. Pierce's testimony, the Court is satisfied that there are "good grounds" supporting Mr. Pierce's opinion. The Court finds based on the record before it Mr. Pierce's methodologies are sufficiently scientifically sound and reliable. *See Mitchell*, 365 F.3d at 244. To the extent that Travelers maintains that Mr. Pierce should have measured the exact amount of snow which sat on top of the roof before its collapse, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Carnegie Mellon University*, 2012 WL 5989194 at *3 (citing *Daubert*, 509 U.S. at 596).

## IV. CONCLUSION

Based on the record before this Court and the foregoing, the Court having found Ryan M. Pierce sufficiently qualified and having used satisfactory methodology, Travelers' Motion [31] is DENIED, without prejudice to be renewed at the close of Plaintiff's case on liability.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date: August 5, 2013
cc: All counsel of record

13